IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| MICHELLE KENNEDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-4252-CV-C-REL-SSA |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michelle Kennedy seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to address the dosage or side effects of morphine; (2) failing to properly consider the opinion of plaintiff's treating physician, James Kinderknecht, M.D.; and (3) failing to properly consider plaintiff's obesity. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.     BACKGROUND

On May 14, 2007, plaintiff applied for disability benefits alleging that she had been disabled since July 19, 2006 (Tr. at 10). Plaintiff's disability stems from back pain. Plaintiff's application was denied on October 1, 2007. On November 6, 2009, a hearing was held before an Administrative Law Judge. On February 25, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On October 12, 2010, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than

2

twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Vincent Stock, in addition to documentary evidence admitted at the hearing.

3

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1995 through 2009:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1995 | $ 163.97 | 2003 | $ 3,189.51 |
| 1996 | 1,510.72 | 2004 | 17,729.40 |
| 1997 | 3,859.30 | 2005 | 17,461.31 |
| 1998 | 7,217.77 | 2006 | 13,475.05 |
| 1999 | 3,261.43 | 2007 | 8,748.71 |
| 2000 | 8,882.68 | 2008 | 0.00 |
| 2001 | 13,191.29 | 2009 | 0.00 |
| 2002 | 19,032.64 | | |

(Tr. at 111, 121, 148).

### Disability Report - Appeal

In an undated Disability Report, plaintiff stated:

I am currently enrolled in school.  I attend class 2.5 hours/night, 2 times/week.  My instructors allow me to lay [sic] down or do whatever I need to do to be comfortable in class.  I have 7 credit hours left to get the degree I have been working for since 1998.  If I leave school my student loans become due within 6 months and I am unable to pay on them at this time.  By staying in school I can continue to defer a little longer.  I want to finish the degree since I'm so close, even if I can't use it due to my disabilities.

(Tr. at 183).

4

*B.*    *SUMMARY OF MEDICAL RECORDS*

On July 19, 2006, plaintiff underwent a magnetic resonance imaging ("MRI") scan of her lumbar spine (Tr. at 199-200). The MRI revealed degenerative spondylitis[1] changes at L2-3 and L3-4, and a shallow disc protrusion[2] at L4-5 without significant canal stenosis[3] (Tr. at 199-200). Steven Street, D.O., of Boone Hospital Center, Pain Management Clinic, performed multiple facet joint injections[4] and epidural steroid injections in plaintiff's lumbar spine and hips between July 2006 and September 2009 (Tr. at 256-57, 260-61, 266, 279, 283-84, 289-90, 293-94, 299-300, 310-11, 316-17, 454-55, 459-60, 464-65, 469-70, 474, 588-89, 595, 600-01, 608-09, 616, 622). Plaintiff underwent L3-L1 facet rhizotomies[5] on July 17, 2006, August 9, 2006, May 4, 2007, and April 14, 2009 (Tr. at 266, 293, 310, 600).

James Kinderknecht, M.D., began seeing plaintiff in September 2006 when she reported chronic low back pain (Tr. at 206-207). Plaintiff indicated that she had had a fusion at L5-S1 for spondylolisthesis[6] when she was 13 years old. Plaintiff reported that she aggravated her back problem on July 20, 2006, when she lifted a 20-25 pound box at work. She reported

---

[1]Inflammation of one or more of the vertebrae of the spine.

[2]Commonly called a disc bulge, a disc protrusion occurs with the spinal disc and the associated ligaments remain in tact, but form an outpouching that can press against the nerves.

[3]Narrowing of the spaces in the spine resulting in compression of the nerve roots or spinal cord by bony spurs or soft tissues, such as disks, in the spinal canal.

[4]A facet injection includes both a long-lasting corticosteroid and an anesthetic numbing agent. The drugs are delivered to the painful facet joint, either inside the joint capsule or in the tissue surrounding the joint capsule. Each vertebra has four facet joints, one pair that connects to the vertebra above and one pair that connects to the vertebra below Corticosteroid injections can reduce inflammation and can be effective when delivered directly into the painful area.

[5]A facet rhizotomy is a procedure that uses an electrical current to destroy the nerve fibers carrying pain signals to the brain.

[6]Forward movement of one of the building blocks (vertebrae) of the spine in relation to an adjacent vertebra.

that she was off work pursuant to the Family Medical Leave Act. "She has been taking Percocet, but is currently out. . . . It is my understanding that I have been asked to look at her and review her history and determine if this is work related." Dr. Kinderknecht had x-rays done and saw that plaintiff had degenerative changes and postoperative changes related to her prior fusion. "She does have some disc space narrowing at the level above between L4-L5. Otherwise, there are no acute changes." Dr. Kinderknecht wrote:

> I really can't relate this directly to a work injury. . . . I just feel that her symptoms are clearly pre-existing. . . . She is currently under treatment with Dr. Street, and I feel that he has been treating her appropriately. . . . I have written her a prescription for Percocet 10/325 #50 to use on an as needed basis. I have given her no further refills and I have instructed her just to contact Dr. Street now for further pain medication. I have discussed this with the patient and I have told her my thoughts at her condition are not linked enough to her job to be considerably related.

On September 29, 2006, plaintiff returned to see Dr. Kinderknecht, indicating that she would like him to became her primary care physician (Tr. at 226). "She is liking a prescription for Percocet which she has been taking on a p.r.n. basis." Plaintiff said she had an appointment the following week with a spine specialist. "I told her I do not mind giving her Percocet to bridge the gap, although I explained to her that this may not be a good long-term medication for her."

On October 2, 2006, plaintiff returned to see Dr. Trecha for low back and bilateral leg pain (Tr. at 205-206). Plaintiff weighed 290 pounds and was 66 inches tall (Tr. at 205). Plaintiff told Dr. Trecha she had been fired from her job as a lab tech the middle of July. She also stated that she does not smoke, which, according to all of the other medical records, was not true. Plaintiff exhibited tenderness in her lumbar spine, but could heel and toe walk without difficulty (Tr. at 205). She had full flexion and extension without irritability. Lumbar x-rays demonstrated no sign of gross instability in flexion (bending forward) and extension

6

(bending backward), but desiccation[7] from L3-S1 (Tr. at 204).

> In a patient who is morbidly obese, certainly, the peri and postoperative complications must be considered and her continued abuse of her spine with her obesity would likely lead to persistent symptoms and an unsatisfactory result with any surgical intervention.

> It is my opinion that she should follow good conservative care measures and aggressively pursue a weight loss program under the guidance of her physician.

Plaintiff returned to see Dr. Kinderknecht on January 16, 2007, and complained of right-sided pelvic pain (Tr. at 222). She reported that facet joint injections helped with her back pain. She was doing fairly well with Percocet although she wanted to take more. Plaintiff had minimal tenderness and a full range of motion with flexion and lateral rotation, but pain with extension. Dr. Kinderknecht discussed an aggressive weight loss program. "She has looked into the bariatric[8] procedures. She is strongly considering this and just wanted my opinion. We discussed this at length, and I really do think she would be a good candidate."

James Scott M.D., met with plaintiff on March 15, 2007, for a consultation regarding her morbid obesity (Tr. at 231-234). "The patient has multiple medical problems associated with morbid obesity which include . . . degenerative joint disease, degenerative disc disease, arthritis, anxiety, depression, . . . spinal stenosis, history of fractured vertebrae, three herniated discs, . . . and joint pain as well as degenerative spondylolisthesis [see footnote 6]." Plaintiff admitted smoking a pack of cigarettes a day and said she had for the past nine years. Plaintiff reported attempting nonsurgical weight loss therapies without sustainable long-term success. Plaintiff weighed 306 pounds. She exhibited a normal gait and appeared in no acute distress. Plaintiff reported daytime sleepiness due to sleep apnea. Dr. Scott told plaintiff that she would

---

[7]An excessive loss of moisture; the process of drying up.

[8]Bariatric Surgery is a procedure performed on people who are dangerously obese, for the purpose of losing weight. This surgery is performed on the stomach and intestine causing a reduction of the patient's food intake. It changes the anatomy of the digestive system to limit the amount of food that can be eaten and digested.

7

need to stop smoking and have two supervised attempts to lose weight before he could proceed with a surgical option.

In April 2007, plaintiff returned to see Dr. Kinderknecht and complained of back pain (Tr. at 218). Plaintiff described sleeping difficulty for which she had been prescribed amitriptyline,[9] but admitted that she did not take it regularly (Tr. at 218). Plaintiff's pain improved with facet joint injections (Tr. at 218). She again requested additional Percocet for her back pain, but Dr. Kinderknecht refused to increase the prescription (Tr. at 218). Later that month, he changed her amitriptyline to Flexeril (muscle relaxer) (Tr. at 329).

On August 3, 2007, plaintiff saw Dr. Kinderknecht to get a new prescription for Percocet (Tr. at 397). The doctor noted that she was not due for a renewal. She asked him what she should do, and Dr. Kinderknecht told her to do a better job of rationing her medication and that he would not renew the prescription. Plaintiff's depression was fairly well controlled. She exhibited tenderness and restricted range of motion due to pain. She had full strength and intact sensation. Dr. Kinderknecht prescribed Mobic (a non-steroidal anti-inflammatory) and Flexeril (muscle relaxer) and he talked to her about trying to lose weight. "I have encouraged her to do exercise and water aerobics and water walking.

Robert Conway, M.D., evaluated plaintiff on September 10, 2007, for back pain that radiated to her legs (Tr. at 403-405). Plaintiff alleged that her facet joint injections did not help at all (Tr. at 404). Plaintiff admitted to continued smoking (Tr. at 404). She weighed 293 pounds (Tr. at 404). Straight leg raising was negative; she was able to come up on her heels and toes, and perform a deep knee bend (Tr. at 404). She had a moderately decreased lumbar range of motion (Tr. at 404). Dr. Conway assessed low back pain and recommended that plaintiff get involved in a core strengthening program and gradually increase her walking and

---

[9]An antidepressant used to treat insomnia.

8

swimming activity (Tr. at 405). He agreed that gastric bypass surgery would be beneficial to plaintiff (Tr. at 405).

Plaintiff returned to Dr. Kinderknecht on October 16, 2007, with reports of increased back pain (Tr. at 399). She had done well on spacing out her Percocet, but again asked Dr. Kinderknecht to increase the prescription (Tr. at 405). She felt that her depression symptoms were well controlled recently (Tr. at 399). Plaintiff exhibited diffuse tenderness and seemed to have some spasms with a very limited range of motion due to her guarding[10] (Tr. at 399). She had negative straight leg raising and normal strength, sensation, and reflexes (Tr. at 399). Dr. Kinderknecht encouraged her to do her home exercises (Tr. at 399).

On January 8, 2008, plaintiff saw Kevin Suttmoeller, D.O., for her first (and apparently only) medical weight loss multi-disciplinary team meetings (Tr. at 408-409). Plaintiff weighed 288 pounds and continued to smoke one pack of cigarettes per day. She was neurologically intact with positive straight leg raising (Tr. at 409).

Plaintiff had her gallbladder removed in May 2008 with postoperative pancreatitis (inflamation of the pancreas) on June 30, 2008 (Tr. at 350, 352, 363-65, 444). Plaintiff received treatment with improvement and was discharged (Tr. at 350, 411). Hip and cervical spine x-rays in June 2008 were negative (Tr. at 382, 384). Similar to her July 19, 2006, MRI, a lumbar MRI revealed multi-level degenerative disc disease and spondylitic changes[11] with disc protrusions[12] and neuroforaminal narrowing[13] (Tr. at 380-81). Based on these results,

---

[10]A sign detected during physical pain whereby the patient involuntarily contracts muscles due to pain.

[11]Inflammation of one or more of the vertebrae of the spine.

[12]Commonly called a disc bulge, a disc protrusion occurs with the spinal disc and the associated ligaments remain in tact, but form an outpouching that can press against the nerves.

[13]Narrowing of the foramen (the opening between the vertebrae through which spinal nerve roots travel and exit to other parts of the body).

9

plaintiff received an epidural steroid injection (Tr. at 452, 454-55).

On September 17, 2008, plaintiff saw Dr. Kinderknecht for a follow up on back pain and depression (Tr. at 401-402). Plaintiff stated that her depression was not doing well and she requested a change in her medications. Plaintiff reported having lost 40 pounds in the previous six months, and Dr. Kinderknecht talked to her about continued weight loss.

On October 15, 2008, plaintiff saw Dr. Kinderknecht and reported increased crying since being on Cymbalta and requested that her medication be switched back to Celexa (Tr. at 514). She had "just diffuse tenderness over the lower lumbar segment." Her range of motion was essentially full with extension (bending backward) bringing out her pain. Straight leg raising was negative. Her mental status was normal. Motor strength was full throughout. Dr. Kinderknecht wrote:

> She has been seeing a physician in Booneville and getting prescriptions written. She has been on MS Contin,[14] and she has been taking 60 mg a day, and then additionally she has been taking Percocet [narcotic] 10/325, taking an additional 3 to 4 daily. She had been prescribed the MS Contin to take bid [twice a day], but she did not do this, and she has continued on the Percocet. She does take Valium,[15] although she states it does not help. She has also been taking some Aleve,[16] and she has felt that to be of benefit. She also recently saw Dr. Street and had some injection, and feels that may help.

Dr. Kinderknecht discontinued Cymbalta and prescribed Celexa and recommended that plaintiff get into counseling (Tr. at 514-515). He also assessed chronic back pain.

> At one point I had her nearly weaned off narcotics, but she is clearly addicted currently. I am going to increase her MS Contin to 60 mg bid. I am going to discontinue the use of the Percocet. I will continue her on the Naprosyn[17] 500 bid. I am going to discontinue the Valium which she did not feel was helpful. I will plan to see her back in 4 weeks. I have encouraged her to continue to work with Dr. Street. My hope is that

---

[14]Controlled-release morphine.

[15]Relieves anxiety.

[16]Naproxen, a non-steroidal anti-inflammatory.

[17]Naproxen, a non-steroidal anti-inflammatory.

10

I can wean her off or significantly down on the narcotics that she is taking. (Tr. at 515).

On November 12, 2008, plaintiff saw Dr. Kinderknecht who wrote, "she has chronic low back pain and is addicted to narcotics." (Tr. at 512-513). Plaintiff admitted that the injections from Dr. Street were helpful; she had had one side of her back done and she was scheduled to have the other side done. Plaintiff's depression had improved after switching to Celexa. Plaintiff had lumbar tenderness, but a somewhat "exaggerated" response to any kind of palpation and she was very guarded. She exhibited full strength and intact sensation. Dr. Kinderknecht wrote, "I would like to try to start weaning her on the narcotics although I do not know how likely this is going to be."

Later that month, on November 25, 2008, plaintiff returned to see Dr. Kinderknecht (Tr. at 510). "Michelle is here concerned about the potential for increased back pain." Plaintiff was scheduled to have more injections by Dr. Street the following week and she said that when she gets them, she typically has increased pain. "She is wanting to have more pain medication." Plaintiff had some lumbar tenderness with limited lumbar extension but normal strength, sensation, and reflexes. Her depression was doing better. Dr. Kinderknecht did not increase plaintiff's medications, but did add Tramadol.[18]

On December 12, 2008, plaintiff told Dr. Kinderknecht that her injections from Dr. Street were beneficial (Tr. at 508-509). Her back was the best it had felt for a while. Plaintiff exhibited minimal lumbar tenderness without spasms; a full range of motion; and normal strength, sensation, and reflexes. Plaintiff's depression was stable. Dr. Kinderknecht renewed plaintiff's prescription for MS Contin but indicated that he planned to decrease her dose "starting next month." He also told her to stop taking Naprosyn, the anti-inflammatory.

---

[18]Also called Ultram, a narcotic-like pain reliever used to treat moderate to severe pain.

Case 2:10-cv-04252-REL   Document 14   Filed 02/21/12   Page 11 of 38

On January 23, 2009, plaintiff saw Dr. Kinderknecht and described sleeping problems, but felt that her depression was well controlled (Tr. at 506). She believed the sleeping problems were due to her back pain. Plaintiff had some lumbar tenderness and pain with lumbar flexion and extension. She had normal strength, sensation, and reflexes, and straight leg raising was negative.

> I really talked to her a lot about continuing to try to lose weight. I have also talked to her about just expectations. I think she was questioning whether to go up on the morphine, and I have really discouraged her from doing this. I have told her that would be a never-ending battle in terms of going up on the dose. Really, I think right now we should try to address her sleep situation, and I have put her on trazodone[19] 50 mg to take at bedtime which she states she has had before and tolerated. . . . She did refill her MS Contin here a week to 10 days ago. Otherwise, I have made no changes. It may be worth getting her in to see Dr. Vinson at some point to see if I can get her off the chronic opioids.

(Tr. at 506).

A week later, on January 30, 2009, plaintiff saw Dr. Kinderknecht and reported that she had fallen five days earlier (Tr. at 504-505). Plaintiff had called in for pain medication, but Dr. Kinderknecht said he had to see her and would not prescribe medication over the phone. Plaintiff said she fell and landed on her hands and knees and then somewhat fell to her right side causing pain in her hip. "Also, she expresses an interest in trying to start weaning from the morphine. She has used Percocet in the past, and we discussed this. She will be due for a new prescription in about 10 to 14 days. She is not currently on any anti-inflammatories. She had some GI upset, and the symptoms were consistent with an ulcer before." Plaintiff's depression was stable. "She is in no distress. She actually looks quite comfortable sitting [on] the exam table." Plaintiff had full range of motion but some pain with extension (bending backwards). Dr. Kinderknecht examined plaintiff's hip and found tenderness over the greater

---

[19]An antidepressant.

12

trochanter[20] but no other tenderness.  She had full range of motion, good strength and no pain with resisted flexion (bending forward), extension (bending backward), abduction and adduction (bending side to side).  Dr. Kinderknecht recommended regular ice on her hip.  He gave her samples of Celebrex.[21]  "If this helps her, and it may help her overall pain level, then I will try to get her insurance to cover it."

On February 10, 2009, plaintiff returned to Dr. Kinderknecht (Tr. at 502).  She felt that her back pain was back to baseline after her fall two weeks earlier.  "Again, we had talked about previously switching her over to Percocet from the MS Contin.  Again, she expresses a desire to stop the narcotics.  I am not sure how realistic that is, but it is worth trying. She has not tried Celebrex yet."

Two weeks later, on February 24, 2009, plaintiff saw Dr. Kinderknecht and said that she was doing better on Percocet with pain control (Tr. at 500).  He recommended getting a

---

[20]One of the bony prominences toward the near end of the thigh bone (the femur).



[21]Non-steroidal anti-inflammatory.

sed rate,[22] rheumatoid factor,[23] and FANA.[24]

On March 10, 2009, plaintiff returned to Dr. Kinderknecht for follow up and admitted that she was doing well with MS Contin 10/325 four times daily (Tr. at 498-499). Plaintiff had some slight tenderness in her back, her range of motion was full, and straight leg raising was negative. Dr. Kinderknecht refilled plaintiff's prescription for Percocet and told plaintiff he planned to decrease her dosage in a month.

Six days later, on March 16, 2009, plaintiff saw Jason Lowe, M.D., complaining of right hip pain (Tr. at 534-536). Dr. Lowe noted that no one had yet prescribed physical therapy. "She is a behavior tech. She is currently petitioning for Disability. . . . She smokes a pack of cigarettes a day. She occasionally drinks. Never uses drugs. . . . Radiographic findings are negative for any fracture, dislocations, [or] evidence of arthritis." Dr. Lowe recommended observation of her condition, non-steroidal anti-inflammatories, and physical therapy. Plaintiff stated that she could not take anti-inflammatories due to a duodenal ulcer, and she

---

[22]Sed rate, or erythrocyte sedimentation rate (ESR), is a blood test that can reveal inflammatory activity in the body. When blood is placed in a tall, thin tube, red blood cells (erythrocytes) gradually settle to the bottom. Inflammation can cause the cells to clump together. Because these clumps of cells are denser than individual cells, they settle to the bottom more quickly. The sed rate test measures the distance red blood cells fall in a test tube in one hour. The farther the red blood cells have descended, the greater the inflammatory response of the immune system.

[23]A rheumatoid factor test measures the amount of rheumatoid factor in the blood. Rheumatoid factors are proteins produced by the immune system that can attack healthy tissue in the body. High levels of rheumatoid factor in the blood are most often associated with autoimmune diseases, such as rheumatoid arthritis and Sjogren's syndrome. But rheumatoid factor may be detected in some healthy people, and people with autoimmune diseases sometimes have normal levels of rheumatoid factor.

[24]Fluorescent antinuclear antibody test. An ANA test detects antinuclear antibodies in the blood. The immune system normally makes antibodies to help fight infection. In contrast, antinuclear antibodies often attack the body's own tissues, specifically targeting each cell's nucleus. In most cases, a positive ANA test indicates that the immune system has launched a misdirected attack on the body's own tissue, in other words, an autoimmune reaction. But some people have positive ANA tests even when they are healthy.

could not do physical therapy because of "funding sources." Dr. Lowe showed plaintiff some IT band stretching exercises.

On April 10, 2009 -- one month after her last appointment with Dr. Kinderknecht when he told her he planned to reduce her dosage of Percocet in a month -- plaintiff told Dr. Kinderknecht that her back pain was the worst it had ever felt (Tr. at 495-496). "Actually, it is probably a comment she makes almost every time I see her." He noted that plaintiff was also seeing Dr. Street and "I have never gotten any records from him." Plaintiff had also told Dr. Kinderknecht that she had an MRI done at Advanced Radiology, but he had never seen the results of that either. Plaintiff said she was taking her Percocet as directed but noticed pain at the end of the time sequence. "She does ask me several questions about her back and I have told her that I just need records from Dr. Street". Plaintiff told Dr. Kinderknecht that Dr. Street does not manage medications. Plaintiff had not lost any weight. She had some tenderness in the lower lumbar region. She had full range of motion although she was guarding. Straight leg raising was negative. She had normal strength, sensation and reflexes. Dr. Kinderknecht refilled plaintiff's Percocet in the same dosage as before and added Neurontin.[25]

On May 5, 2009, plaintiff returned to see Dr. Kinderknecht and started off the interview crying, stating that Percocet was not helping and she did not plan to go back to see Dr. Street because she was frustrated with him (Tr. at 493-494). Plaintiff's lumbar spine exam was "quite similar to previous exams." Dr. Kinderknecht increased plaintiff's trazodone because she complained of decreased sleep. "I have given her a new prescription for Percocet, but I do not want her to go up any; in fact, I would like to wean her off. I told her today that really I think that the increased symptoms that she is having are not due to the fact that the Percocet is not working but more due to the fact that she may be depressed. She is on Celexa. I

---

[25]Also known as Gabapentin, used to help control certain types of seizures in people who have epilepsy. Gabapentin is also used to relieve burning and stabbing aches and pains.

15

have continued this, but that may be something we need to consider changing as she is at her max dose now."

A week later, on May 12, 2009, plaintiff saw Dr. Kinderknecht for a well woman exam (Tr. at 490-491). She reported that she had been to the Bariatric Clinic (although the records show she went to the Bariatric Clinic a couple weeks later). She also said that her depression symptoms were well controlled and that she was sleeping much better on the trazodone. "She is a smoker and smokes about a pack per day and has for about 12 years. She does have occasional alcohol use and occasional binge drinking. She has been exercising more regularly lately, although just for about 5 to 10 minutes at a time." Her assessment included "migraine headaches which have been stable." Dr. Kinderknecht talked to plaintiff about "regular exercise."

On May 26, 2009, plaintiff saw Kevin Suttmoeller, D.O., for reevaluation of possible bariatric intervention (Tr. at 524-526). Plaintiff reported having tried multiple non-surgical techniques for losing weight in the past, including seeing a registered dietician, without long-term success. The records indicate that plaintiff reported smoking a pack of cigarettes a day for the past ten years and that she was at the time employed as a behavioral technician trainer. Plaintiff weighed 282 pounds. "I have told her the first thing she has to do is go ahead and quit smoking. When she gets that done, we will go ahead and move forward."

On June 2, 2009, plaintiff saw Dr. Kinderknecht for a follow up on back pain (Tr. at 488-489). Plaintiff "has now decided that the morphine works better for her than the Percocet." Plaintiff said she was trying to walk and use the exercise equipment, but she described herself as very limited. She told Dr. Kinderknecht that she was scheduled for bariatric surgery in a few months. She did not mention the prerequisite that she stop smoking. Although Dr. Kinderknecht recommended on plaintiff's last visit that she stop using the Nuvaring since she had not had a period in a year, plaintiff was still using it. She indicated

16

that she would stop using it to see if she would have a period "after her vacation in July." Dr. Kinderknecht agreed to switch plaintiff back to morphine. "I was somewhat hesitant to switch her to the Percocet to begin with. We will put her back on MS Contin 60 mg to take bid [twice a day]. . . . I am very supportive of the idea for her to have bariatric surgery in view of her chronic low back pain. She is morbidly obese."

On June 30, 2009, plaintiff saw Dr. Kinderknecht for a follow up (Tr. at 486-487). "She is back on the morphine extended release, . . . MS Contin 60 mg bid [twice a day]. When I ask her how she is doing, she has the standard answer that she is doing horrible. She states she has not been sleeping well. She is taking the trazodone 100 mg at bedtime or the Flexeril at bedtime, but she has not been taking both. She is wondering about increasing her Flexeril." Plaintiff had full range of motion in her spine, although she somewhat guarded as she flexed. Straight leg raising was negative. "I am going to keep her on the MS Contin 60 mg bid. I think she is going to be on this long term. I do think she should increase her trazodone dose to 150 mg at bedtime."

On July 31, 2009, plaintiff saw Dr. Kinderknecht for a follow up (Tr. at 484-485). Plaintiff reported more pain "and especially more leg pain in the last couple weeks. She cannot attribute it to anything in particular." Plaintiff's exam was essentially the same as before.

> I had a long discussion with Michelle today that I do not think she does well emotionally with her pain. She has tried to get in to see a psychologist at my urging, and apparently, no one takes her insurance. Also, her insurance does not cover physical therapy, and so, I have told her she is just going to have to try to do this more on her own. I have encouraged her to get out and walk, even if it is uncomfortable. Also, I have suggested looking for some self-help books in terms of her dealing with chronic pain. I am going to try to get some references for her. I just think she is emotionally doing quite poorly with her chronic pain. I have explained to her clearly she has pain and real pain, but emotionally, she does poorly with this. I have also explained to her that I think she is going to have bad periods, and she is clearly in one. With the leg pain, I think it may be beneficial to put her on a short burst of prednisone. I have recommended we put her on 40 mg a day for 4 days and then 20 mg a day for 4 days. I have left the rest of her medications the same.

17

On August 10, 2009, plaintiff saw Dr. Street for a follow up (Tr. at 595).

She has been on the internet researching pain control devices. She wants to discuss spinal cord stimulation.[26] She has Medicaid. I do not believe it is possible the equipment will be covered with that insurance. However, she wants to discuss an implanted pump.[27] I would rather not sentence her to chronic opioid therapy, though I would be willing to trial [sic] Prialt[28] with her. We discussed in detail the trial and the side effects of Prialt. We will check insurance to see if Prialt is covered with Medicaid. We will set her up for a trial if it is covered. What has prompted this is her oral morphine being less effective in controlling her pain than it has been. She has been building tolerance over the past few years, and her prescribing physician does not want to increase the dose. We will investigate the Prialt option.

On August 28, 2009, plaintiff returned to see Dr. Kinderknecht for a follow-up on her back pain (Tr. at 481-482). She mentioned that she had tried Claritin for allergies but got no relief and she wanted to try Allegra. She had tried to increase her dose of trazodone but decided she would like to try Ambien (treats insomnia). Plaintiff complained of continued diarrhea (at Dr. Kinderknecht's direction, she had had a work up, stood studies which were

---

[26]Spinal cord stimulation uses low voltage stimulation of the spinal nerves to block the feeling of pain. A spinal cord stimulator, a small battery-powered generator, is surgically placed under the skin to send a mild electric current to the spinal cord. A small wire carries the current from a pulse generator to the nerve fibers of the spinal cord. When turned on, the stimulation feels like a mild tingling in the area where pain is felt. Pain is reduced because the electrical current interrupts the pain signal from reaching the brain.

[27]The fluid filled space around the spinal cord is called the subarachnoid or intrathecal space. Cerebrospinal fluid (CSF) flows through this area, bathing and protecting the brain and spinal cord. An intrathecal drug pump delivers medicine directly into the CSF, bypassing the path that oral medication takes through the body. The pump is a round metal device about the size of a hockey puck that is surgically implanted beneath the skin of the abdomen. A small plastic tube, called a catheter, is surgically placed in the intrathecal space of the spine and is connected to the pump. A space inside the pump called the reservoir holds the medication. The pump is programmed to slowly release medication over a period of time. It can also be programmed to release different amounts of medication at different times of the day, depending on the patient's changing needs. The pump stores the information about the prescription in its memory, and a doctor can easily review this information with the programmer. When the reservoir is empty, the doctor or nurse refills the pump by inserting a needle through the patient's skin and into the fill port on top of the reservoir.

[28]Also known as Ziconotide -- a non-narcotic pain reliever that works by blocking pain signals from the nerves to the brain. Ziconotide is used to treat severe chronic pain in people who cannot use or do not respond to standard pain-relieving medications.

negative, and a colonoscopy which was normal). Plaintiff asked to have her B12 level checked with the labs -- she thought that may be the source of her fatigue. Plaintiff had been having no headaches. On exam she had full range of motion in her back, no spasm, but some diffuse tenderness in the lower lumbar region. Dr. Kinderknecht refilled plaintiff's MS Contin in the same dose; prescribed Allegra; discontinued her trazodone; prescribed Ambien; ordered blood work including a B12, complete blood count, and comprehensive metabolic panel; and recommended dietary guidelines for diarrhea.

On September 22, 2009, plaintiff returned to see Dr. Kinderknecht for a follow up (Tr. at 479-480). Plaintiff told Dr. Kinderknecht that Dr. Street could not do the intrathecal pain pump "as they were planning. A lot of this has to do with her insurance and medication." Plaintiff said she planned to see a Dr. Fisher to see if he would perform the procedure. All of plaintiff's lab work came back normal. Plaintiff was in no distress, she had no muscle spasm, but some diffuse tenderness in her back. He continued her on MS Contin at the same dose, finding that her back pain was "stable at this dose."

Following the administrative hearing, Dr. Kinderknecht completed a physical residual functional capacity questionnaire (Tr. at 624-628). He found that, due to spondylolisthesis and spondylitis of the lumbar spine, obesity, and depression, plaintiff could stand for one hour at a time for a total of two hours in an eight-hour workday and sit for one hour at a time for a total of at least six hours in an eight-hour workday. He said plaintiff would need a job that allowed shifting between sitting and standing positions. Plaintiff could occasionally lift ten pounds; rarely twist, crouch or squat; and never stoop or climb ladders. He found that plaintiff's impairments would interfere with her concentration and attention for simple tasks frequently and that she would miss work about four days a month. He sated that her limitations began prior to September 2006.

*C.*     *SUMMARY OF TESTIMONY*

During the November 6, 2009, hearing, plaintiff testified; and Vincent Stock, a vocational expert, testified at the request of the ALJ.

**1.     Plaintiff's testimony.**

At the time of the hearing, plaintiff was 29 years of age (Tr. at 11). She has a bachelor's degree (Tr. at 12). Plaintiff lives alone in a mobile home (Tr. at 12).

Plaintiff last worked in 2007 as a telephone collections agent at MediCredit (Tr. at 12-13). Although the ALJ pointed out reports indicating plaintiff worked in May 2009, plaintiff stated that she was fired from her last job in April 2007 (Tr. at 13). Plaintiff was fired because "I couldn't sit for very long, I needed to stand up to be able to work a full day, and I had a headset and everything so I didn't think it would be a problem. Because I needed time off to get spinal injections, they told me they couldn't work around me." (Tr. at 20-21).

Plaintiff cannot work due to the pain in her back and legs and the side effects from morphine (Tr. at 13). She experiences fatigue, shaking, tremors, irregular sleep, and she gets hot easily (Tr. at 13). She suffers from withdrawal if she does not take her dose on time (Tr. at 13).

Plaintiff is addicted to narcotics (Tr. at 14). She has repeatedly asked to get off of narcotic pain relievers, she has gotten epidural steroid injections and neuro-ablation (Tr. at 14). She is investigating other pain management techniques (Tr. at 14).

Plaintiff testified that she has been diagnosed with fibromyalgia and chronic fatigue syndrome by Dr. Kinderknecht and Dr. Rumpf with Boone Pain Management Associates (Tr. at 15-16).

Plaintiff's last weight measurement was 285 pounds (Tr. at 16). She spends her days sleeping, watching television, reading books (Tr. at 167). Plaintiff sleeps an average of 12 to 14 hours per day -- sometimes more sometimes less (Tr. at 22-23). She does not sleep for

20

more than two to three hours at a time (Tr. at 23).  She wakes up because she needs to shift positions and she cannot do that in her sleep (Tr. at 23).  She takes care of her mobile home, she prepares her own meals, she drives about once a week, she shops, she does her own laundry (Tr. at 16-17, 19).  Plaintiff estimated she could walk about five minutes at a time -- her doctor told her to use her exercise machine (the Gazelle)[29] not more than five minutes at a time maybe twice a day, but not to overdo it (Tr. at 17).  She can stand for five minutes at a time, but she shifts position every minute or two (Tr. at 17).  She can sit for ten to 15 minutes before needing to stand up (Tr. at 17).  Plaintiff can lift five or ten pounds -- she is not supposed to lift more than that, and some days she cannot even lift that amount (Tr. at 17-18).  All of plaintiff's doctors have told her to limit her lifting to five pounds, or a gallon of milk -- only what is necessary and nothing frivolous or unnecessary (Tr. at 22).

Sometimes plaintiff is unable to stand long enough to take a shower, and many times she is unable to lift her legs to put pants on so she wears one-piece dresses (Tr. at 18).  The ALJ pointed out that her doctors have repeatedly told her that her condition would improve if she lost weight (Tr. at 18).  She testified that she is planning to have bariatric surgery "after the first of the year" and had not had it done yet due to scheduling conflicts (Tr. at 18).  The ALJ pointed out that her doctors have also repeatedly told her to stop smoking (Tr. at 18).  Plaintiff said that she has cut down to a half a pack a day, and it is her intention to quit "by the end of the year" (Tr. at 18).  When asked how she is paying for her cigarettes, plaintiff said that her

[29]



friends buy her cigarettes for her (Tr. at 18-19).

Plaintiff suffers from depression -- she is sad, she has had suicidal thoughts and tendencies, and she cries a lot (Tr. at 19). Plaintiff cries for about 20 minutes on some days and all day on others (tr. at 21). It depends on her sleep and her pain level (Tr. at 21). Plaintiff takes medication for her depression, but she does not see a psychiatrist, psychologist, or therapist (Tr. at 19). Plaintiff's mother pays for her medication (Tr. at 19). She is having trouble finding a psychiatrist in her area who takes Medicaid and she is still working on finding one (Tr. at 19). Plaintiff has been on Medicaid since May 2007 (Tr. at 20).

Plaintiff is trying to find a doctor who can do an intrathecal morphine cocktail (see footnote 28) so she can get off the oral narcotics (Tr. at 21-22). According to the studies, she will not have side effects like she does now (Tr. at 22). She believes she would no longer have tremors, fogginess and bad memory (Tr. at 22).

Plaintiff's doctors have told her that she is inoperable and that she must take narcotics for the rest of her life (Tr. at 24). She continues to have pain despite the drugs she is on (Tr. at 24). Plaintiff gets a little relief from pain by lying on her side with a pillow between her knees -- but that lasts only about 15 minutes (Tr. at 24). Although plaintiff's medical records refer frequently to her addiction to Percocet as opposed to morphine, plaintiff stated that she was not addicted to Percocet and did not even take it like she was directed to because she did not like the way it made her feel (Tr. at 25). Plaintiff's medical records refer to her occasional binge drinking; however, plaintiff said that she "used to drink maybe once a month but not to get drunk." (Tr. at 27). Friends would take her out to cheer her up and she would have maybe a beer or two, but she no longer does that (Tr. at 27-28).

## 2.  Vocational expert testimony.

Vocational expert Vincent Stock testified at the request of the Administrative Law Judge. The first hypothetical involved a person limited to light work who can occasionally climb stairs

and ramps but never ropes, ladders or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; can frequently but not constantly push and pull with her lower extremities; should avoid concentrated exposure to unprotected heights, excessive vibration and hazardous machinery; and is limited to performing unskilled work (Tr. at 31). The vocational expert testified that such a person could perform plaintiff's past relevant work as a cashier (Tr. at 32).

The second hypothetical involved a person limited to sedentary work who would need to rotate positions frequently; occasionally climb stairs and ramps but never ropes, ladders or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; can frequently but not constantly push and pull with her lower extremities; should avoid concentrated exposure to unprotected heights, excessive vibration and hazardous machinery; and is limited to unskilled work (Tr. at 32). The vocational expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 32). However, the person could be an assembly line fabricator, DOT 739.684-094, with 3,000 such jobs in Missouri and 120,000 in the country (Tr. at 32). The person could be a wafer/braker/semiconductor, DOT 726.687-046, with 2,500 jobs in Missouri and 100,000 in the nation (Tr. at 32-33).

The third hypothetical was the same as the second except the person would need to take occasional unscheduled disruptions of the work day and work week due to effects of medication, would have the need to lie down for extended periods of time during the day, and would have an inability to concentrate and focus on the job at hand for extended periods of time (Tr. at 33). The vocational expert testified that such a person could not work (Tr. at 33).

V.     *FINDINGS OF THE ALJ*

Administrative Law Judge Michael Mance entered his opinion on February 25, 2010 (Tr. at 42-51).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 44). Plaintiff earned $13,475 in 2006 prior to her alleged onset date and $8,748 in

23

2007; however, her monthly earnings in 2007 were below the substantial gainful activity level (Tr. at 44).

Step two. Plaintiff's severe impairments include degenerative disc disease and degenerative joint disease of the lumbar spine, narcotic addiction, obesity, and depression (Tr. at 44).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 44).

Step four. After finding plaintiff's subjective complaints not entirely credible (Tr. at 49), the ALJ found that plaintiff retained the residual functional capacity to perform sedentary work with the ability to rotate positions frequently; limited pushing and pulling with the legs; may occasionally climb ramps and stairs but never ropes, ladders or scaffolds; may occasionally balance, stoop, kneel, crouch, or crawl; should avoid concentrated exposure to excessive vibration, industrial hazards and unprotected heights; and is limited to unskilled work activity (Tr. at 45). With this residual functional capacity, plaintiff cannot perform her past relevant work as a behavioral technician, cashier, collection clerk, lab technician, office manager or waitress (Tr. at 49).

Step five. Plaintiff can adjust to other jobs available in significant numbers and is therefore not disabled (Tr. at 50).

## VI.    *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Specifically, plaintiff argues that her complaints of pain should have been considered credible because she "underwent a failed lumbar fusion, she has complained of and been treated for chronic back pain since at least July 2006, she underwent multiple facet joint steroid injections, facet rhizotomies, and hip joint steroid injections" and because plaintiff's idea of getting spinal cord stimulation did not materialize because Medicaid would not pay for it. Plaintiff cites Cox v. Apfel, 160 F.3d 1203 (8th Cir. 1998), to support her position.

24

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

Case 2:10-cv-04252-REL   Document 14   Filed 02/21/12   Page 25 of 38

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> In reaching this conclusion, I have considered her subjective complaints. The claimant has an adequate earnings record, but she remains a very young woman of only 29 years of age. Within her Disability Report, she noted, "I've had to keep changing jobs due to my condition. I haven't had any luck finding something that worked for me." The claimant is clearly limited in the type [of] work activity she can perform, as she needs to be able to alternate positions frequently in addition to her other restrictions. Although she has been advised over and over to lose weight and to stop smoking, she has not lost significant weight and has not stopped smoking. There was no indication that she has undergone the recommended water therapy exercise program. She testified that she was going to attempt to stop smoking by the end of the year, but she has been advised to stop smoking for years. The claimant clearly has pain and discomfort and must perform work allowing position flexibility. Based on statements from Dr. Kinderknecht, she takes her current medications without significant adverse side effects. After careful consideration of the evidence, I find that the claimant medically determinable impairments would reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 49).

In Cox v. Apfel, 160 F.3d 1203 (8th Cir. 1998), the case relied upon by plaintiff, the Eighth Circuit remanded a case with directions for the ALJ to further develop the record. The ALJ had, among other things, found the claimant not credible and found that she could perform sedentary work because two doctors had said that if she could reduce her dosage of morphine and learn to deal with her pain, she could work. The claimant in that case had undergone three back surgeries and had a morphine pump implanted into which she required greater and greater doses of morphine. That case is easily distinguishable.

Here plaintiff had one back surgery when she was 13 years old. No other doctor recommended back surgery. Additionally, the suggestion of an implanted morphine pump came from plaintiff, not from any of her doctors. Plaintiff's back problems are, if not caused, certainly greatly aggravated by her morbid obesity. That was not the case in Cox. Plaintiff's doctor agreed to perform bariatric surgery to help her lose weight, on the condition that she

stop smoking. Again, this was not the case in Cox. Plaintiff chose to continue smoking making bariatric surgery impossible. Therefore, plaintiff's continued smoking has prevented her from taking a major step toward decreasing her back pain, suggesting that her pain is not disabling as she alleges.

Plaintiff's doctors have consistently told her to exercise, walk, perform water aerobics, essentially any kind of physical activity, to help her condition and to help her lose weight which all agree would improve her back pain. Plaintiff has not followed through with any of those recommendations. She testified falsely at the hearing that her doctors told her to limit her exercise activity (on her Gazelle) and not overdo. This is completely contrary to what her treating physicians have told her for years. Plaintiff testified that she had been diagnosed with fibromyalgia and chronic fatigue syndrome; however, I have not found such a reference in the medical records and plaintiff does not in her brief point to any medical record discussing fibromyalgia or chronic fatigue syndrome.

The medical records establish that plaintiff told Dr. Kinderknecht that she was scheduled for bariatric surgery. However, she had been told by the surgeon that he would not schedule that surgery until she stopped smoking -- a relevant fact that she left out when talking to Dr. Kinderknecht. She testified at the hearing that the lack of surgery was due to scheduling conflicts. However, as of the hearing, plaintiff continued to smoke and was therefore ineligible for the surgery and her "schedule" was irrelevant.

The "failed surgery" plaintiff mentions in her argument occurred when she was 13 years old. Plaintiff's doctors repeatedly told her she was not a candidate for any surgery on her back during the relevant time due to her morbid obesity. Despite that plaintiff did not lose weight, she did not perform the walking, water aerobics, or other exercises her doctors recommended ("even if it is uncomfortable"), nor did she stop smoking so that she could have bariatric surgery to reduce her morbid obesity. The medical records show that plaintiff

attended one supervised weight loss consultation in January 2008. There is no evidence that she attended any more sessions.

The ALJ properly considered plaintiff's failure to take the necessary steps to reduce her weight, either through diet or surgical recommendations. If plaintiff's limitations precluded all work activity as she alleged, she would have sought all reasonable methods to reduce her weight including stopping smoking so that she could undergo the repeatedly recommended gastric bypass surgery. Gray v. Apfel, 192 F.3d 799, 804 (8th Cir. 1999); Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991). The ALJ properly considered plaintiff's obesity in connection with her disability claim and found that her noncompliance with treatment undermined her claim that her impairments were disabling.

The ALJ considered the medical evidence and found that plaintiff's subjective allegations were not supported by the objective evidence to the extent alleged. See 20 C.F.R. §§404.1529(c)(1)-(2) and416.929(c)(1)-(2) (ALJ should look at the medically documented "signs" and findings to determine the intensity and persistence of the symptoms and how they actually affect the person); Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) ("[L]ack of objective medical evidence is a factor an ALJ may consider."). The records show that plaintiff complained of hip pain; however, her complaints were not substantiated by the objective testing (Tr. at 222, 305). Plaintiff's first complaint of hip pain was in a call to Dr. Kinderknecht asking for more narcotic pain medication after he had refused to increase her dosage due to her back pain. The objective testing shows that plaintiff had normal hip x-rays, bone scans, and MRIs (Tr. at 242, 246-49, 384, 535). The doctor recommended that she use ice on her hip. The ALJ observed that plaintiff had some lumbar tenderness, but did not have any sensory or motor deficits (Tr. at 46, 205, 207, 307, 367, 397, 423, 429, 440, 480, 482, 484, 488, 496, 502, 504, 506, 508, 510). Plaintiff had full strength and intact sensation (Tr. at 207, 367, 397, 399, 409, 480, 482, 484, 488, 496, 502, 504, 506, 508, 510, 512, 514).

She had a normal gait (Tr. at 234). She could go up on her heels and toes, and deep knee bend (Tr. at 404). She did not appear in any acute distress (Tr. at 48, 214-15, 218, 220, 222, 224, 228, 233, 274, 401, 406, 479, 488, 500, 502, 504, 506, 508, 510, 512, 514). See McCoy v. Astrue, 648 F.3d 605, 614 (8th Cir. 2011) ("McCoy's complaints of disabling pain are inconsistent with repeated observations from treating and consultative physicians that McCoy was not in acute pain or distress"); Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (discrediting claimant's allegation of disabling pain where, inter alia, claimant's treating physician repeatedly noted claimant "appeared to be in no significant distress.")

The ALJ properly noted that further surgery beyond that she received as a child was not recommended for her back impairment, but rather "conservative" treatment was recommended for this impairment. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (conservative treatment and no surgery is consistent with discrediting the claimant). As discussed above, plaintiff's back pain was caused by or greatly exacerbated by her morbid obesity. Plaintiff did not pursue the repeatedly recommended surgery to alleviate this cause. Instead, plaintiff chose to continue to smoke, against medical advice, rather than undergo a surgery to improve her condition. Plaintiff's need to receive continued treatment for her back pain is due to her noncompliance with instructions to lose weight and to stop smoking so that she could have surgery to help her lose weight.

Plaintiff's being prescribed MS Contin, or extended-release morphine, does not automatically establish her pain as disabling. The medical records show that plaintiff occasionally paid lip service to reducing her narcotic use; however, she consistently requested more narcotics at higher dosages and complained of new pains whenever her doctor refused her request. The records also establish that Dr. Kinderknecht fairly regularly prescribed whatever plaintiff requested and only occasionally rejected her suggestions for medication. The first time he saw plaintiff he prescribed Percocet, a narcotic, even though he knew she was

being treated by Dr. Street and he believed that treatment was adequate, and he also agreed that the next step should be an epidural steroid injection which is more conservative than narcotic use. In September 2006, Dr. Kinderknecht wrote, " I do not mind giving her Percocet to bridge the gap [until her appointment the following week with a spine specialist], although I explained to her that this may not be a good long-term medication for her." Yet, years later Dr. Kinderknecht continued to prescribe narcotic medication for plaintiff on a regular basis. He even noted in his records that plaintiff "always" said her back hurt worse than it ever has when she came to see him. Shortly after plaintiff got a bridging-the-gap Percocet prescription from Dr. Kinderknecht, Dr. Trecha, an orthopedic specialist, wrote, "It is my opinion that she should follow good conservative care measures and aggressively pursue a weight loss program."

A few months later, plaintiff reported to Dr. Kinderknecht that facet joint injections helped with her back pain and she was doing fairly well with Percocet "although she wanted to take more." Dr. Kinderknecht found that plaintiff had minimal tenderness and full range of motion and that she needed to lose weight, but he gave her a new prescription for Percocet. Two months later, Dr. Scott noted the myriad conditions plaintiff was suffering due to her morbid obesity. Those conditions included degenerative joint disease, degenerative disc disease, arthritis, spinal stenosis, anxiety, and depression. Her weight contributed to sleep apnea which caused plaintiff to be drowsy during the day. At that time she was told to stop smoking and make a supervised attempt to lose weight prior to Dr. Scott considering bariatric surgery. Instead of complying with Dr. Scott's recommendations, plaintiff returned to Dr. Kinderknecht the following month and asked for a higher dose of Percocet and medication to help her sleep. A few months later, plaintiff went to see Dr. Kinderknecht for more narcotics -- he noted it was not time for her to get a new prescription and he recommended she try losing weight, exercise, do

water aerobics and water walking.  He prescribed a muscle relaxer and an anti-inflammatory.

The following month she saw Dr. Conway for back pain, and he recommended she lose weight, exercise, and consider gastric bypass surgery.  This of course would require plaintiff to stop smoking, which she did not do.  Instead a month later she went back to Dr. Kinderknecht and asked him to increase her Percocet dose.  She was told to do home exercises.  This resulted in a long break in her visits with Dr. Kinderknecht.

A year later when plaintiff went to see Dr. Kinderknecht, he noted that she had been seeing a doctor in Booneville who was writing her prescriptions.  At that time she was taking both Percocet, a narcotic, and MS Contin, which is extended-release morphine.  Dr. Kinderknecht noted that plaintiff was "clearly addicted" to her prescription pain medication. From that point on, the doctor's records indicate he worked with plaintiff's addiction, acknowledging that she was addicted and would likely not receive significant pain relief as her tolerance increased.  He noted multiple times that weaning plaintiff off narcotics would not likely work, but this is clearly after his last attempt to stop prescribing narcotics which led to plaintiff getting even more narcotics from other doctors.  The month after she returned to Dr. Kinderknecht, she came back asking for an increase in her narcotic medication.  He did not increase the dose, but he did continue to prescribe narcotics and added other non-narcotic medication.  The following month he renewed it again, but told plaintiff that the next month he wanted to start weaning her off.  When the next month rolled around, plaintiff talked to him about increasing her morphine rather than beginning the weaning off process.  He talked to her again about losing weight and he noted in the records that she needed to get off the chronic opioids.  A couple days later plaintiff called his office asking for more narcotics, saying she had

fallen. He refused to give her medication over the phone and made her come in. When she did come in, Dr. Kinderknecht observed that plaintiff's hip was essentially normal, despite her complaints of hip pain. This was one of the few times when plaintiff said she wanted to get off narcotics, but she actually suggested switching from one to another instead of reducing her dose with an eye toward stopping the narcotics. Dr. Kinderknecht told her to use ice on her hip and gave her samples of an anti-inflammatory. By a couple weeks later, plaintiff had not even bothered trying the anti-inflammatory samples she had been given. This certainly supports the conclusion that plaintiff was seeking narcotics rather than seeking to relieve her pain.

A short time later, Dr. Kinderknecht refilled plaintiff's Percocet prescription after finding on exam that she had only some slight tenderness in her back, her range of motion was full, and straight leg raising was negative. Plaintiff indicated that she did well on MS Contin (morphine); however, Dr. Kinderknecht told her again that he planned to decrease her dose of narcotics by the following month. A week later she went to see Dr. Lowe who recommended observation of her condition, non-steroidal anti-inflammatories, and physical therapy. Plaintiff rejected those suggestions, saying that she could not take anti-inflammatories due to a duodenal ulcer, and she could not do physical therapy because of "funding sources." Dr. Lowe showed plaintiff some IT band stretching exercises. Plaintiff then went back to Dr. Kinderknecht.

On her next appointment with Dr. Kinderknecht -- one month after he told her he planned to reduce her dosage of Percocet in a month -- plaintiff told him that her back pain was the worst it had ever felt, and he noted that she says that every time she sees him. Plaintiff had not gotten her medical records from Dr. Street despite Dr. Kinderknecht's requests, and she told him that Dr. Street does not manage medications. However, this appears to be inaccurate as almost three

years earlier plaintiff was referred to Dr. Street for medication. Dr. Kinderknecht refilled plaintiff's narcotic medication and added another non-narcotic prescription.

A month after Dr. Kinderknecht insisted on seeing plaintiff's medical records with Dr. Street, she told Dr. Kinderknecht that she did not plan to see Dr. Street anymore. His records were never seen by Dr. Kinderknecht. Dr. Kinderknecht refilled plaintiff's narcotic medication at the same dosage and tried to convince her that her pain was really due to depression. A week later plaintiff saw Dr. Kinderknecht and said that she had recently been to the bariatric clinic; however, the medical records show that she did not go to the bariatric clinic until two weeks after this appointment with Dr. Kinderknecht. Dr. Kinderknecht again talked to plaintiff about getting regular exercise.

A few days after she was told that she could not have bariatric surgery until she stopped smoking, plaintiff -- who continued smoking -- told Dr. Kinderknecht that the surgery was scheduled. He was very much in favor of the surgery plaintiff knew she was not going to have, because he believed her back pain was caused by her morbid obesity. Plaintiff asked him to change her Percocet back to the morphine, and he did so at her request. He was concerned about her lack of menstrual periods and told her to stop using the Nuvaring, but despite that potential health problem plaintiff chose to wait until after her vacation to comply with that treatment recommendation.

About a month later, Dr. Kinderknecht examined plaintiff and found that she had full range of motion in her back and straight leg raising was negative. Despite that almost normal exam, he indicated he planned to keep plaintiff on the morphine and indicated he thought she would be on this long term. He did not state that she <u>needed</u> to be on it long term. However, in

33

the three years since he had begun treating her, plaintiff had been on narcotic pain medication, she had repeatedly requested larger doses, she had gone to different doctors to get the narcotic pain medication when he did not give it to her, and he acknowledged long before this visit that plaintiff was addicted. It is clear from these records that Dr. Kinderknecht was treating a drug addict more so than a patient with incurable and disabling back pain. Plaintiff had no interest in any treatment other than narcotic pain medication and she clearly did whatever necessary to keep the prescriptions coming. At the next visit, Dr. Kinderknecht talked to plaintiff at length about her emotional reasons for wanting the narcotic -- she had declined his suggestion to get therapy and she had declined his suggestion to get physical therapy by simply stating that her insurance would not cover it. The evidence establishes that plaintiff was covered by Medicaid and although there is nothing more about this in the record, it is doubtful to me that plaintiff could not get counseling or physical therapy through Medicaid. In any event, it was not broached again after plaintiff dismissed these suggestions so cavalierly. Dr. Kinderknecht told plaintiff she would, then, have to try to do more on her own, including walking and other types of exercise, even if it was uncomfortable. She chose not to.

A couple weeks later plaintiff returned to see Dr. Street, even though she had falsely told Dr. Kinderknecht that she did not plan to see Dr. Street again and never obtained Dr. Street's treatment records for Dr. Kinderknecht's review. Instead of trying to exercise to lose weight as Dr. Kinderknecht had suggested, plaintiff talked to Dr. Street about implanting a morphine pump. She told Dr. Street that her prescribing doctor, or Dr. Kinderknecht, did not want to increase her dose of morphine even though she had built up a tolerance to it. She did not tell Dr. Street that Dr. Kinderknecht knew she was addicted to the drug and continued prescribing it

34

despite her moderate abnormalities on exam. Later than month, plaintiff returned to see Dr. Kinderknecht. She said she wanted a prescription for Allegra -- she got a prescription for Allegra (and this was despite her knowing that her Medicaid insurance would not pay for it). She said she wanted her B12 level checked -- he ordered blood work to check her B12 level. Plaintiff had full range of motion, no spasm, and only some tenderness, yet Dr. Kinderknecht wrote another prescription for morphine.

On her next visit, plaintiff told Dr. Kinderknecht that Dr. Street could not do the implanted morphine pump "like they were planning" but that she had plans to talk to another doctor to see if he could. She did not mention that Dr. Street nixed the idea before plaintiff's last visit with Dr. Kinderknecht, and if the reason was because Medicaid would not pay for it, going to a different doctor would make no difference. All of plaintiff's lab work had come back normal, she was in no distress, she had no muscle spasm -- she only had some tenderness. And Dr. Kinderknecht wrote a prescription for morphine.

The Eighth Circuit, in Cox v. Apfel -- the case so strenuously argue by plaintiff in support of her motion for summary judgment -- remarked that, "Another objective medical fact supporting Cox's subjective complaints of pain is the consistent diagnosis of chronic lower back pain, coupled with a long history of pain management and drug therapy, including the implantation of the intrathecal morphine pump. It is obvious that physicians have determined Cox was experiencing great pain." Id. at 1208. In this case, the medical records establish that plaintiff's objective tests were not far from normal, and her doctor continually prescribed morphine and Percocet (a narcotic) because he knew plaintiff was addicted to those drugs. He tried getting her to lose weight -- he suggested exercise, but she did not do it; he suggested

bariatric surgery, but she refused to stop smoking so that she could have the surgery; he suggested that her depression was causing her to experience pain and that she should see a counselor, but she nixed the idea stating that Medicaid would not pay for it; he suggested physical therapy, and she again refused, stating that Medicaid would not pay for it. Plaintiff herself came up with the idea of an implanted morphine pump, and this was her alternative to stopping smoking and losing weight. The circumstances of this case could not be more different from those of the plaintiff in the Cox case.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's complaints of disabling pain are not credible.

## VII.    OPINION OF TREATING PHYSICIAN

Plaintiff argues that the ALJ improperly failed to consider the Residual Functional Capacity Questionnaire completed by Dr. Kinderknecht in which he found that plaintiff would, among other things, miss four days of work per month and that her impairments would interfere with her concentration and attention for simple tasks frequently.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

Dr. Kinderknecht's medical records and treatment have been discussed at length in the preceding section and will not be repeated here. He clearly had a lengthy treatment relationship with plaintiff and he saw her regularly. The nature and extent of the treatment relationship appears to be more his treatment of her narcotics addiction and morbid obesity; however, plaintiff refused to follow his treatment advice. His medical records do not support the prescriptions for morphine and chronic use of Percocet. His medical records do indeed mention over and over plaintiff's addiction to these drugs and his inability to get her to wean herself off of them. His medical records do not mention a lack of concentration, either in a finding or in a complaint. Dr. Kinderknecht's findings in the Residual Functional Capacity Questionnaire are not supported by medical signs or laboratory findings and they are not consistent with the record as a whole. Every other doctor whose records appear in this transcript recommended conservative treatment and significant weight loss. The only surgery any doctor ever considered was bariatric surgery to help plaintiff lose weight. The significant restrictions listed in Dr. Kinder's RFC questionnaire are not consistent with the treatment records of Dr. Trecha, who is an orthopedic specialist and recommended conservative measures and an aggressive weight-loss program.

I find that the substantial evidence in the record as a whole supports the ALJ's decision not to rely on the restrictions listed in Dr. Kinderknecht's Residual Functional Capacity Questionnaire.

## VIII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 21, 2012

Case 2:10-cv-04252-REL   Document 14   Filed 02/21/12   Page 38 of 38